Branch Banking and Trust Good morning, may it please the Court, I'm Jeff Levinger for LNV Corporation. What the District Court did in this case, I think, gives parties a perverse incentive to breach contracts when the damages relate to something happening in the future. What the Court, the Court began by correctly holding that BB&T breached the participation agreement by reducing the loan amount and by releasing the guarantors without getting our consent, which was required under Paragraph 14A. The Court also correctly held that the breach caused injury to LNV. The Court held that in the June 15, 2011 opinion. But then the Court awarded LNV zero damages despite the injury-causing breach. I submit to the Court that in ruling in this fashion, the Court both misconstrued the participation agreement, in particular, Paragraph 14B, and the Court misapplied both the law of this Court and the law of Georgia by effectively elevating the standard of the burden of proof that we had to apply in this case. So can I ask you about 14B, because I'll confess, I just don't think I understand your argument from 14B, given 14B's plain language that says that BB&T had the right but not the obligation to repurchase your stakes. So how is it that that converts into an obligation to repurchase your stakes? Well, it isn't our point, necessarily, that it converts into an obligation. But here's our point. And I think the District Court kind of got hung up on this notion of 14B just being a right and not an obligation. But I think it really misses the point of our argument. Here's our argument. When LNV didn't consent to the proposed settlement with a guarantor, at that point, BB&T had three options. Option one was to not go forward with a deal at all, to just say we can't go forward with a settlement because we don't have the consent of LNV. Option two was to go forward with a settlement but to do so by repurchasing our interest in the participation under paragraph 14B. And where does option two come from, just so I'm clear? If not 14B, it doesn't come from the plain language of 14B. So where does it come from? Well, and that ties into option three, Your Honor. Option two, it does come from there because what 14B says is if you don't have our consent, in essence, you can't go forward with a deal. But if you want to go forward with a deal without our consent, the repurchase option kicks in. Now here's option three. Option three is they go forward with a deal but they do so by breaching. In other words, they don't exercise the repurchase option and they don't get our consent. And all we're saying is by choosing option three rather than option two, all we want is to be put back in the same place, contract language 101, be put in the same place that we would have been in had they performed, that is by doing option two rather than breaching by doing option three. That's all we're saying. But performance under option two was never mandatory, right? Wouldn't BB&T just say option three was a valid option but we're going to have to pay the freight of walking down the path of option three. We're going to have to pay some breach damages if proven, right? I mean, there's not like a liquidated damages provision in option two, right? No, it's not that. No, but what I'm saying is by choosing to breach rather than to perform under 14B by we're seeking is to be put in the exact same position we would have been in if they performed and that's the contract doctrine. Let me ask you the question this way. Accepting that, doesn't L&V clearly have the burden of proof as to the damages sustained for this breach? Well, yes, Your Honor, and there are really two paths to getting to the result that we seek here. One path is... But I'm simply asking who has the burden of proof and then we'll get to what the burden of proof would be. You would agree that L&V as the plaintiff in this case claiming to have been aggrieved has the burden of establishing with some reasonable degree of concreteness the nature and extent of the damages sustained, right? Yes, yes. And my point on that, that's really talking more about the remand path here. If the court doesn't go under the 14B rendition where you simply look at the face amount of the balance, apply our percentage interest and subtract out the amount that was received. The question is putting you back by your own account. The question is putting you back in the same condition you would have been in but for the breach to try as best you can to make you whole in the case. Correct. What damages did you establish with a sufficient degree of concreteness in this case? The breach was the sale of Owl's Hand Loan without L&V's consent. That was the breach. For $2.5 million when the face amount of the loan was $34.5. What I want you to tell me is what was the measure of damage and how you proved it in this case? Right. Well, apart from the 14B measure, which is just a straightforward apply the percentage to the loan amount. What Your Honor is talking about I think is sort of the different path of looking what reasonably would have happened had they not breached and had they gone with the litigation to try to collect on the loan. I look at it in terms of what reasonably would have happened. Right. Your position is but for the error of not getting your consent, the case would have been litigated and a substantial sum would have been resulted from that suit, right? That's the other part of our argument. The 14B is our primary argument. Let's move beyond 14B for the purpose of my question. Sure. Yes, that's the theory. And on that issue, I think the court correctly found that Duncan, that is the guarantor against whom they were pursuing the suit, did have the ability to satisfy a judgment in full, a judgment for $34.5 million. The court made that finding and it was supported by the evidence. Where the district court went astray, I think, is in three errors. I think any one of which necessitates a remand. Error one was this. The BB&T would have obtained a judgment against the guarantor. Absolute certainty. Don't you argue here, at least I took your brief to argue, that you face the less severe burden of proof for showing the amount of damages because of BB&T's wrongdoing. Don't you make that argument? Yes, Your Honor. But I don't understand why the burden is different in a normal breach of contract case. Well, here's... You cite antitrust law, but it looks to me to be very different. Well, all we're saying is this, and this also comes from this, I think, a very important case, the Harmon case. Harmon v. Allstate out of this court. And what it says basically is that uncertainty as to the cause of damages or the fact of damages can be an issue, can warrant a zero award. But when you don't have uncertainty as to cause, and here the court found that there was a cause of damages as a result of the breach. When all you may have, and I'm not saying we do, but when all you may have is uncertainty as to the amount, then the rule of leniency comes into play. That's precisely what the court held in the Harmon case. And all you look at is a reasonable degree of certainty. Now, here, it's evident from their own witnesses, from their own internal memos, that a judgment would have been obtained, at least more likely than not. I think Judge Marcus's initial question, though, which I'm still uncertain about, is what number did you prove to a reasonable degree of certainty in the district court and how? Setting aside 14B, it's not 23% of $34.5 million or whatever. What number did you prove in the district court to a reasonable degree of certainty? Your Honor, I'll answer it two ways. One is we proved our percentage attorney $4.5 million through the line of cases saying that when, basically, you're entitled to the amount of, to your percentage of the contract amount. The amount earned under a contract sets up a prima facie case of your damages and the burden then shifts to the other side to show why the amount should be less than that. Does that argument rest in any way, shape, form, or fashion on 14B? I would say that it's somewhat independent, but it kind of corroborates our approach under 14B. Now, separate from that, we take the position that if we're required to show what reasonably would have happened, sort of within a suit framework, we did show that and we gave the court all the ingredients that it needed, all the data points it needed to come up with a number that may have been less than $34.5. Now, to be sure, we didn't suggest a number less than our percentage of $34.5, but we didn't have to. Under the Harmon case, the plaintiff testified to a number that was the full amount. The jury came in with a lesser amount. The court said that's perfectly acceptable. Let me ask a question this way. Because the data wouldn't support that. We're reviewing what the trial court did as a finder of fact, right? Yes. As a trier of fact in the case. To the extent the trial court found that the evidence was insufficient to prove actual damages, you've got to satisfy not only that she was wrong, but that her findings amount to clear error unless there was a legal error somehow in the methodology. And that's what we contend, Judge Marcus. But holding aside your purported legal error and looking at this simply for clear error review, where would the clear error be in her finding of fact? I would say twofold. One was in the issue of whether a judgment would have been obtained. The court overlooked the testimony from their own lawyers that they had a 70% to 80% chance of prevailing based on the Deng's Doom Doctrine, based on FIREA Section 1823, and even a higher chance on appeal of obtaining a judgment against the guarantor. What the trial judge said was it had no credible way to evaluate the relative strength of the party's legal positions, much less how to predict where, if anywhere, the proceedings would have gone. And then she laid out some areas where she thought the proofs were insufficient. And that's the problem, Judge Marcus. Not only is it clear error, but it's based on a misperception of the law because, again, absolute certainty isn't required. We offered Plaintiffs' Exhibit 28, 29, 34, 39, all of which established that some of these were pleadings in the underlying case showing how the application of Deng's Doom would result in a 70% or more than a 70% to 80% chance of prevailing. Where in the trial judge's opinion did she say that the burden she was holding you to was absolute certainty? Well, with respect to the judgment, I think that was the effect of it. No, no, no, I understand. But I read that opinion a couple of times, and I never heard her say that you were obliged to meet a standard of absolute certainty. If she did, that obviously would be error. It would be legal error, and I think it would be reversible error. Right. But I don't read her to say that. Maybe you can point me to where in her order she said she was holding you to a standard of absolute certainty or even something that was approximating absolute certainty. Well, for example, when the court said the evidence shows that Duncan had the ability to satisfy the full amount of the judgment, but I don't see any evidence that he had the willingness or would have cooperated in doing so. That, I submit, imposes a heightened standard of proof not required by any law whatsoever. All one needs to show is the ability to pay, which he had as a result of Plaintiff's Exhibit 117, his financial statement, which showed that he had a $48 million net worth that actually doubled the next year. The law does not require that we also show that he would have cooperated in doing so, and that's a legal error that I think completely tainted the court's determination that we used reasonable certainty. I think that was a big one. And then I think the court conflated, again, the questions about uncertainty as to the fact of damage with uncertainty as to the amount of damages. We proved the fact of damage, and once we did, only reasonable certainty is required both as to whether a judgment would have been obtained and whether that judgment would have been collected, and the evidence shows that we proved both. Can I ask a question? Sure. Real quick, without, of course, without divulging any client confidences, can you explain to me, I would have thought that the ordinary way of proving some damages short of the whole enchilada under 14b would have been putting a damages expert on, especially in a, to me it seems complex, financial transaction like this, but there wasn't any damages expert testimony. Why was that? Frankly, Your Honor, I think an expert on damages might have been daubered out in a case like this. We put on better witnesses who were experts, the lawyers handling the underlying case, the loan officers, the financial statement of the guarantor, and the guarantor's deposition where he admitted under oath that his financial statement was accurate and indeed had doubled roughly in the following year. I frankly think what we put on were experts who indeed had personal knowledge of the facts. I think that's all that was required and should have been required in a case of this nature. Thank you, counsel. We will give you the full four minutes on rebuttals since you were asking our question. Sorry, yes. Good morning and may it please the Court. Good morning. My name is David Clem. I represent the Appley Branch Banking and Trust Company. This is a breach of contract case, but it's a certain kind of contract, a participation agreement. This isn't a suit on a promissory note or a guarantee. This isn't a suit that involves a promise to pay of any kind between the two parties. In fact, it involves numerous very clear disclaimers of that promise to pay in the participation agreement. Paragraph 1, this is a sale without recourse. Paragraph 5, LNV shares in the losses, and it specifically says those losses include losses that follow actions taken by BB&T after a default. Paragraph 11, this is not an extension of credit. So we don't have a debtor-creditor case. What is this? It's a participation agreement. It's a general intangible. At summary judgment, the district court found that BB&T breached the participation agreement, but it reserved the question of damages for trial. So the question at trial was, was the value of this general intangible greater than the Now, the nature of this case is important because of the cases that LNV asks this court to consider. It cites cases like the Willison case, which is a 2013 Georgia appellate case, and it cites National Van Lines, a Fifth Circuit case from 1967. Those cases and others involve a promise to pay. One of them is a salesman who the court found that the commissions were earned and payable at the time of the sale, regardless of what happened underneath. The other one is similar. It's a COD agent. The analogy in this case would be if BB&T had said, we promise to pay you 23% of the underlying debt, regardless of what happens. And from the face of the document, that simply isn't so. So on appeal, LNV asked the court to pick a number to value that general intangible, and that's something that it did not do at trial. In fact, the trial court wrote in her opinion, certainly mathematical certainty, this is mathematical certainty isn't required, but surely LNV must come up with some mathematical, with some calculation. And it failed to propose anything other than the full amount of the debt. So the arguments that LNV now makes in part four, maybe of its brief, what I'll call kind of the halfway measure, something between full 14B, whole enchilada, and nothing, those arguments were not really vetted in the trial court? Never raised at trial, Your Honor. And for that reason, there can be no error because that question was never presented to the trial court. The trial court was never asked to come up with a number less than the full amount of the debt. So LNV cites cases like the advanced telecommunications case, which is an 11th Circuit case, but it refers to bankruptcy statutes. The bankruptcy statute from New Jersey in a fraudulent transfer context, and the question was, was the debtor company insolvent? And that bankruptcy statute required the court to value the assets and liabilities of the debtor company. So that certainly isn't this case. There's no law or statute that requires the trial court to relieve the plaintiff of its burden to prove its damages. So contrary to what counsel said earlier, the court did not find causation in this case. The court wrote, this is a quote from the order, LNV, quote, cannot prove that it actually suffered a loss, end quote. And why is that? Because, frankly, the open questions, the questions unanswered by the evidence in this case are manifest. Would BB&T have gotten a judgment? If so, when? Summary judgment, maybe, trial, appeal? There's testimony in the court that maybe it would have gone to an appellate court. How long would that take? How much would it cost? What would LNV's proportionate share of those expenses be? What's the interest rate that applies, and when would that run to and from? There's no evidence of any of those things. There was testimony of fraudulent transfer cases. Would this possibly involve later suits? Would it involve charging orders to get at the closely held business interests that LNV claims could have satisfied the entire amount of the debt? Could that have eaten up all of the obligor of liquidity? None of those questions were answered. And those are the right questions for the trial court to ask because the touchstone of Georgia law and, frankly, most jurisdictions is when you evaluate the question of damages, the touchstone, the Georgia statute says, you get damages that arise naturally and flow from the natural course of things. So that's the question that the district court asked. That's the question that this court asked in a very similar case called Federated versus FDIC from 2016. In that case, participation agreement. The participant said, we would like all of the money. There was a $5 million debt. The FDIC's receiver for the lead bank settled that debt for 1.9. The participant said, I would like all of it. You breached the contract in two ways. You didn't keep me informed and you didn't go after the stock. And the court in the 11th Circuit upheld this ruling. The court found, asked the question, what would have happened if you had tried to liquidate the stock? Was there a market for that stock? If we had kept you informed in a different way, what decisions might you have made? Those are the same questions the district court asked. It's the same questions these court asked in Federated. This court asked in Federated. So I guess what you're saying is there may be reasonable questions to have been asked here about what precisely that number is and how you get there, but they just weren't vetted in the district court. Yes, Your Honor. In fact, even the very first question, the first question might reasonably be, would BB&T have won the summary judgment motion? And the district court said, well, I can't even answer that question because we don't even have the full amount of the briefing of the underlying debt. I don't even have that much. So I can't answer that question. I certainly can't answer, what would the percentage be at trial? How long would that take? What would the percentage be on appeal? How long would that take? What expenses would be involved? So let me ask you this, just in following up on my last question to your opponent. Maybe I'm right, maybe I'm wrong that a damages expert here would have been sensible, but sort of what kinds of, he said they put on lots of proof, better than a damages expert. Why wasn't that sufficient to help the district court come to some number? The district court's order, in fact, answers that question. The testimony at trial was from LNV's witnesses, I will get all of the debt. And the question at trial was, well, are you certain about that? And at one point they said, absolutely certain. Would have gotten the whole amount of the debt. At another point, they backed off that testimony a little bit. But so there are three pieces of testimony that counsel for LNV mentioned. One was the testimony from their loan officer and he said, I've gotten all of it. Well, how long would that have taken? I don't care because I would have gotten all of it. And two was the financial statements from Mr. Duncan, the solvent guarantor. And the district court in her order said, well, that's all I had. That the only evidence I had, there was no finding that he could have paid this debt. Was there any lawyer testimony? I'm sorry, Your Honor? Was there any lawyer testimony on the point? Yes, Your Honor. There was testimony from Mr. Petrie and Mr. Remington, the two lawyers that prosecuted the underlying debt. And they explained, among other things, the statement that LNV's counsel mentioned, this 70 to 80 percent chance. This wasn't a, what this was, was an early case assessment in response to a form required by the FDIC. In other words, the lawyers were requesting the dench dune powers from FDIC. So, yes, Your Honor, the. Probabilities of success were 75, 80 percent? In an early case assessment. I understand. Yes, Your Honor. Yes, they did. In response to a form from the FDIC, the district court considered that in her order. And she said she applies, sitting as fact finder, what she is evaluating the relative weight of that statement. She says she accords little weight to the testimony of an interested party on an early case assessment. And once again, that would only answer the very first question. Would they have won at summary judgment? Would they have won at trial? It doesn't answer any questions about the likelihood of collection or the obstacles involved in collection. How hard are you fighting, in the present posture, the question whether you breached? I am fighting it, Your Honor. So, the question of breach, I think, has two components. One, did, so, pardon me, the BB&T did not breach the participation agreement for at least two reasons. One, that BB&T's breach is limited to instances of its bad faith. And the contract says that in two places, paragraph 5 and paragraph 9. In the district court's summary judgment order, she didn't mention, the court did not mention paragraph 5. And that paragraph says, L&V shares in losses, especially, including losses that follow actions taken after breach, except for those that come from BB&T's bad faith, gross negligence, willful misconduct. That's, I think, a very clear limitation of liability. A similar limitation occurs in paragraph 9, that's entitled, no liability. In that paragraph, the district court did mention, and the district court said, well, this doesn't limit liability clearly. And I have two responses to that. One, it ignores paragraph 5, that does clearly limit liability. And two, the way the district court read paragraph 9, it's, in fact, an expansion of liability. The district court found that BB&T could be liable for any of its actions or omissions if anything was required by the loan documents. And that greatly expands liability. So that's my first point, Your Honor, in response to your question. My second point is, admittedly, a difficult one, the paragraph 14 analysis. And there's paragraph 14a and 14b. 14a begins with the sentence, with the phrase, subject to the terms of this agreement. Now, paragraph 14a is only one sentence long. So there can be no question that that limiting phrase applies to the entirety of the paragraph. So paragraph 14a says BB&T must get consent for these five actions, modification, forbearance, release, collateral, et cetera. Paragraph 14c says it also begins with the limiting phrase, except as otherwise provided. And the question may come, well, does that apply to the entire paragraph? Well, that paragraph's four sentences long. And if you read carefully the first sentence of paragraph c, that essentially says BB&T can do anything at once, after default, or at any other time. I was going to ask you, what does that last phrase mean, or at any other time? It seems to, like, swallow the entire provision. I think it would if it didn't have that opening limiting phrase. The district court found that that limiting phrase applied to the entire paragraph and therefore made 14c subservient to 14a. I would argue that the fair reading of that is that that limiting phrase applies to the first sentence. And it must, because otherwise the first sentence says you can do anything, anytime. So reading through paragraph 14c, it applies what courts that have analyzed participation agreements are very familiar with. That's the deadlock resolution mechanism. And that's the only place in this contract that appears as the only way to get out of a deadlock. Paragraph 14a doesn't have it. So I think that there's one way, and only one way, to read these two paragraphs harmoniously to give effect to the entirety of the contract. And that is that 14c applies in a post-default environment. And we know that because 14c defines the term default. Defines default, and it requires notice by BB&T to LNB. The parties come together. They have five days. If they can't make a decision, then the decision of BB&T carries the day. There's no such mechanism in 14a. And one of the questions I think that tripped up the district court when she analyzed these provisions was, well, what are these things in 14a seem to apply only in default? But that's not so. There are many times when a borrower may approach a bank and ask for a workout of some kind. Can we please extend the maturity date? Can we please release some collateral? Can we please do this, this, or this? And they may ask for all those things. Now, in a pre-default scenario, there's no urgency. There's no need necessarily to have a deadlock resolution mechanism because the collateral is not impaired and the liquidity is adequate and things of that nature. But in a post-default environment, in this environment especially, this is the northern part of flora that was hit very hard by the economic crisis. We have collateral values that are plummeting. We have guarantors that have lost liquidity and things of that nature. Now we're in an urgent environment. And that's where the cases like Caran d'Aulette, which is a Seventh Circuit case from 1979, it analyzes these same questions. And in fact, it anticipates BB&T's response—or pardon me, LNV's response. LNV says, well, you don't need the deadlock resolution mechanism because you can simply buy me out. That exact provision occurs in the Caran d'Aulette case. And the Seventh Circuit in Caran d'Aulette said, well, that's no resolution at all because this is a troubled debt. The lead bank isn't going to want to buy a troubled debt. If that's so, then you're essentially arming—this is the language of the Mark Twain case, also from the Seventh Circuit—arming the participant bank to take advantage of the lead bank. Now that would be an industry-wide problem. If participants could simply hold veto power over the actions of the lead bank. Let me ask you a slightly different question. Assume for the purposes of my question that there was no clear error in the district court's finding about the failure of proof on actual damages. She could have awarded nominal damages, couldn't she? Quite frankly, Your Honor, I'm not sure the answer to that question. I don't know what the basis for nominal damages may be when the court specifically said— The reason I said, you have—accepting, one, that there was a breach of contract here, and two, that the court was unable to ascertain the amount of damages because the proofs were insufficient and it was hard to show, why wouldn't she be—why wouldn't she have been within the power to actually award nominal damages? I don't know where that authority would come from, Your Honor, and it would contradict the court's— Well, it comes from the statute and the case law in Georgia allows for nominal damages in a variety of circumstances. If you look at the Georgia Code, in every case of breach of contract, the injured party has a right to damages, but if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action. Georgia Code annotated 13-6-11. If you look at the restatement of contracts, it says the same thing. They didn't seek it. I understand that, but I'm just sort of curious about that. Well, you took the words out of my mouth, Your Honor, that firstly, they didn't ask for it. Secondly, could they—could the court have awarded nominal damages? Possibly. I concede that that's possibly true. Quite frankly, I hadn't analyzed the issue because it hadn't come up on the appeal, but it would contradict the court's finding in its order that L&V cannot prove that it actually suffered a loss, cannot prove. So would a nominal damages under that statute be appropriate? Quite frankly, Your Honor, I haven't read the cases, so I don't know the answer to that, but I'd like to return, if I may, with my last couple of moments to talk about the industry view here. The industry view is, from the Carondelet case, the Mark Twain case, First National, what L&V is asking for is veto power. He wants—L&V wants to hold the lead bank hostage, and if their interpretation of this contract was correct, Your Honors, why would they ever consent to any modification proposed by the lead bank when they can simply extract the full amount of the debt and make BB&T the guarantor? Thank you, Your Honor. Thank you. The suggestion seems to be that we tried this as an all or nothing case. That is simply not true. In paragraph 51 of our First Amendment complaint, we pled the 14B measure. In paragraph 50, we said, for the foregoing—the foregoing breaches by BB&T have damaged L&V, including by destroying its 23.08 interest in the Owl's Head loan, which is equivalent to a loss of $7.4 million, or such other sum as L&V may show would have been recovered from Owl's Head in the guarantor under the terms of the Owl's Head loan documents. But did you ever specifically say to the judge, even if you were not entitled to the whole thing, the $7.4 million, you were entitled to something more than $577,000, so the spread was somewhere between those two numbers. Here's where that number might have settled out at. Did you ever offer her a specific amount and proofs behind that? Not as to the spread between $0 and $7.4, but we did— No, I'm talking about the spread between $577,000 and $7.4 million. We didn't offer a specific number, Your Honor. I would say that under the Harmon case, we were not required to do so because we gave the court all the ingredients to find all the data points to find the number— Okay, so if I understand your position, it is you did, in fact, ask the court to come up with a number less than the full amount if she didn't award the full amount, but you didn't tell her what that number was. Correct, correct, and I'm not sure it would have been appropriate necessarily to do that. That I'm at a loss to understand. Why would it have been inappropriate for you to say, as a default position, we think we're entitled to the full $7.4 million, but even if you find that we haven't met that burden, and we think we have, we're entitled to a whole lot more than $577,000. In fact, we're entitled to X, Y, or Z, and here's why. Well, we did say, Your Honor, that there was a problem and bad faith was exhibited with respect to the allocation of the $10 million settlement, and we said that was a slightly different measure that we did give the court. We said instead of allocating $2.5 million to Owlset and $7.5 million to JLD, it should have been the exact opposite in accordance with your own internal memoranda like Plaintiff's That measure, just based on the reallocation alone, based on the bad faith that the court, I think, was very concerned about, that provides significantly more than $577,000. It also provides the basis for attorney's fees. But how would she know where to settle a sum if you didn't tell her? Well, with respect to the reallocation, we did tell her. We said, just look at their own internal memoranda, which allocated 78%, which said that 78% should be allocated to Owlset, 78% of $10 million. So instead of splitting $2.5 million, you're splitting roughly $7.5 million. We gave her that. Now, as to the amount we would have collected, as to the collectability issue between $577,000 and our percentage of $34.5 million, to be sure, we did not give her a number. But what we gave her were data points, including the 70%, 80% that their own witnesses said, which it's not just a statement of an interested party. It's an admission of a party opponent and their agent. It was an admission. And he testified that he maintained that opinion up to the very end, that there was a 78% chance, based on the Deng's Doom Doctrine, of prevailing on this case. We gave her a financial statement, extraordinary evidence that you ordinarily don't have in a case that was sworn by the guarantor to be accurate. And it showed that he had the net worth. The bottom line is that the court, I think, had discretion to fix a number between the $577,000 and the upward number. What the court did not have the discretion to do is to award zero. To quote the Thomas Moat case from the Georgia Court of Appeals, zero was not a reasonable measure of damages in this case. It was not a reasonable sum. Something in excess, whether you get there through the reallocation or the other means, would have been the reasonable measure of damages in this case. Thank you very much. Thank you. Thank you both for your efforts. We will take a 10-minute recess and then we'll come back with the last case, Interactive Communications v. Great American Insurance. Thank you.